### FOSTER COAL CO. v. LEANDER MOHERMAN ET AL.

LIABILITY OF LESSEE FOR RENT WHILE MINING PILLARS OF COAL.

The lessor of coal, located under the surface of his lands, brought on an action against the lessee thereof to recover a certain sum of money alleged to be due the former from the latter under the terms of their lease.

Such lease provided, in substance, that installments of certain amounts, named therein,. should be paid yearly so long as the lessee was holding under said lease and mining coal from under said lands.

At the trial of such action, the evidence disclosed that the defendant had so mined and excavated the coal under said lands as to allow certain pillars of coal to stand for the purpose of preventing the superincumbent land from sinking, and that the defendant had subsequently mined and removed said pillars of coal.

*Held:* It was not error for the court to instruct the jury that if they found it was usual and customary in such business, to mine out and remove such pillars, and the defendant was engaged in the business of mining and removing such pillars, then, while so engaged, the defendant should be regarded as holding under said lease and mining coal from said lands, and therefore, would be liable to the plaintiff for such installment of rent as became due while the defendant was so engaged in mining such pillars.

LAUBIE, J. (orally).

The case of *The Foster Coal Company* v. *Leander Moherman et al.* is brought to reverse the judgment of the court below in an action brought by the defend-ant in error to recover on a lease of coal under the lands of Moherman.

It is perhaps necessary only to say now that the lease provided that a roy-alty of at least $1000 per year should be payable in October of each year to the lessor by the lessees " so long as they hold this lease." The lease was made to Kyles and by them assigned to the Foster Coal company, and while the action was against the Kyles originally, the Foster Coal company was brought in upon an answer and cross-petition of the Kyles, and subsequently it was agreed that the Kyles were not responsible to plaintiff on the lease, but whatever responsibility rested upon any one to the plaintiff rested upon the Foster Coal company, consequently there was a verdict for the Kyles and against the Fos-ter Coal company.

The first cause of action was for rent claimed to be due and payable October, 1889, and the remaining causes of action, four in number, were to recover the $1,000 yearly thereafter. That is, in October, 1890, 1891, 1892 and 1893 and, as we understand it, the jury returned a verdict against the Foster Coal company for these amounts, finding that the company was holding the lease for the pur-pose of the mining of coal under the land during all of that period.

There is no dispute here between counsel that the lessees were required to pay the $1,000 yearly so long as they were holding the lease and mining coal from under the lands.

There seem to be in the main two objections that are presented and urged to us as errors on the part of the court below, and they are in reference to certain portions of the charge of the court to the jury, that the charge of the court allowed the jury to find that the defendants were holding the lease while they were taking out pillars from the mine, and consequently that it left the jury to say that the defendants were holding the lease, within the meaning of that term, if there were pillars left in the mine.

There was no direct issue made upon either of these propositions. The only issue in reference to them was a denial upon the part of the coal com-pany that they were holding the lease during the period set up in the plaintiff's

petition, and the only allegation in reference to pillars was that the defendant did not mine pillars because it was necessary to leave them to support the superincumbent land from falling in and being damaged. No claim is made in the defendant's pleading, as is claimed here, that they were entitled to maintain the pillars in the mine by reason of the fact that under the lease they were entitled to hold the mine for the purpose of transporting the coal from adjacent lands through the entries. They make no such allegation in their answer, but they do allege and they only allege that they did not mine the pillars because it was necessary to leave the pillars there to prevent the sinking of the land and damage to it. But we do not pretend to say that the matter of itself was not an issue, because it was necessary in order that the plaintiff should recover for the years claimed in his petition, for him to show the defendants were still holding the lease—in other words, were still mining coal from the lands, and it would not be sufficient to show that they were holding under the lease simply and only for the purpose of transporting coal through the entries from the adjacent land.

The issues being such, we turn to the evidence to ascertain what that was in reference to the proposition, and it is not necessary in considering this question to determine upon whom the burden of proof rested to show that there was no minable coal left in the land at any period prior to October, 1893. It is sufficient to say that all of the evidence upon that proposition comes from the defendant coal company's witnesses, and therefore whatever those witnesses say upon that question settles that proposition of fact, being undisputed.

It will not be necessary for me to turn to the record, as I think I can state sufficiently definite the evidence upon that point. Passing by the statements of some of the coal company witnesses, that within a week of the trial they had been mining out some coal for use in their boilers—coal from some pillars in the mine—the evidence of these witnesses shows clearly that if they had ceased mining coal at all it had been but four or five months prior to the trial, and that trial was in April, 1894, so that according to this testimony they were mining coal from the bank up to and after October, 1893. The last eighteen months of mining, from the statement of these witnesses consisted in the removal of the pillars. The boss of the mine, Kedgwin Head, in his testimony, explains fully the workings of the company in the mine. He described all of the entries that had been driven through the mine and the various rooms leading off from those entries, and he testified that for the last eighteen months of mining they were mining pillars, and he made it definite that drawing pillars was mining coal, and there was no counter statement from witnesses upon that proposition. They were mining the pillars during those eighteen months. Some of the months they drew out a considerable quantity of coal and some not so much. April, 1892, they mined nearly 600 tons, and in another month subsequent to that they mined out 191 tons. Now in his direct examination—I speak of the mine boss, Head—he testified that they mined out all of the pillars except in the main and anchor entries, at least all that were minable and that could be mined with any degree of safety with reference to the condition of the roof; so that according to the defendant's own evidence they had mined out all of the pillars in the bank that were minable, save in those two entries. They therefore had mined out not only the room pillars but the entry pillars, except in those two entries, and in reference to the anchor entry, while it was some distance from the main entry, (the only one that was used to transport coal from other lands), he stated that it was necessary in his opinion to leave the pillars in the anchor entry. Some of the pillars in the rooms, it was stated, were 300 feet long and perhaps from six to t enty feet wide. The width is not so definitely stated, but it is fairly to be inferre that the width of those pillars was from six to twenty feet, and consequently there must have been a considerable amount of coal in all of the pillars in the rooms of that mine when they ceased mining the coal fr n the face of the rooms, or had mined out all of the rest of the coal. Now, we think that

being engaged in this work for eighteen months—mining out these pillars—would indicate one of two things—either that there was a great quantity of coal left in those pillars, or they had put in an entirely inadequate force of miners. If the pillars contained but a modicum of coal, a few men would have mined it out in a very short time; if it contained coal of any considerable quantity, then a large force applied to it would have mined it out in a much less time than eighteen months. It was something that was in the power and control of the defendant company. It was their pleasure, whether they put in a sufficient force to mine that out rapidly, and thus stop the payment of the $1000.00 a year, or temporize with it, as perhaps they did, and if they did that, certainly nobody could be blamed except themselves.

Now, what were the rights of the lessor in this respect? He had the right under that lease to have the lessees mine out the coal in the ordinary and usual method practiced in such business; and to compel them, and they were bound to take out all of the coal underlying the land, that was minable with economy and profit, whether it consisted of pillars.300 feet long or coal directly from the face of the rooms following the lead of the vein, if it were usual and ordinary for persons engaged in that business to mine such pillars; and it may be said in passing that the defendant company recognized this as correct, because they were engaged as they say for eighteen months in mining out the pillars.

Now, with this statement of the matter, and recurring to the objections made that the charge of the court permitted the jury to find that the defendants were holding the lease under its terms while mining out pillars, and that it left the jury to say the defendants were holding the lease, if pillars remained in the mines, we can tell, by an examination of this charge, whether the court gave the law correctly or not, or whether or not it did really allow the jury to do as the plaintiff in error now claims.

I will not take the charge up to read it, because it is somewhat lengthy, but I have taken off short notes of it for reference, and the parts I refer to are found on pages 127, 128, 129 and 132. Now, the court instructed the jury that the defendant was to pay the installment of $1,000 a year so long as it continued to hold the lease, and that if it continued to operate under the lease *in the ordinary way of mining coal* at the close of each year, then they should pay that year's installment. That if they mined out all of the minable coal in any one year, excluding entry pillars, then they were to pay only for the amount mined out that year, and not the full installment of $1,000, unless the royalty would amount to that. That the jury could not find that there was minable coal still existing under the land because of pillars left in the entries that might be mined, nor could they find from the fact that pillars were left in the entries that might be mined, that the defendant was holding the lease under its terms; and that the ordinary way of mining meant the usual and customary manner of conducting and carrying on this particular business, and that if the jury found it was usual and customary to mine and remove the pillars from the rooms in the mine, and should find defendant was thus engaged, that would be mining in the ordinary manner, and would be a holding of the lease while so engaged.

It will be noticed that the court in the charge made a distinction between the room pillars and the entry pillars. So far as the entry pillars were concerned, the court told the jury distinctly that because entry pillars were left in the mine, that might be mined with economy and profit, still from that fact they could not find there was minable coal left in the mine, nor could they from that fact find that the defendant coal company was still holding the lease under the terms of it : so that, so far as allowing the jury to find because there were pillars left in the entries, the defendant company still held under the lease, the cour' told the jury directly the contrary—they could not so find from that fact. The cu rt did say to the jury that so far as the room pillars were concerned, if it was usual and customary to mine out those pillars in the business, and the defendants undertook to mine and remove such pillars, while so engaged they should be regarded

as holding under the lease or be responsible for whatever installment would be due the plaintiff by reason of that fact. Now, if therefore, the jury found that it was usual and customary in that business to mine out and remove room pillars, then certainly the jury should find that while so engaged the parties were holding the mine under the lease, and it is immaterial whether we say it was or was not the duty of the court to instruct them absolutely as it did, that if that was the usual manner of mining out by parties in that business, the defendant should be regarded as holding under the lease, or whether it should have been left to the jury as a fact to be found by them. There could be no prejudice to the plaintiff in error whether the court gave it as a rule of law or not, because under the evidence the jury could do nothing else but so find, as it was undisputed, that for eighteen months before they quit mining, and until after October, 1893, when the last installment was claimed on the part of Moherman, they were engaged in mining out the pillars in the rooms. That they were also engaged in mining out the pillars in the entries is entirely immaterial, because the court instructed the jury, in substance, that drawing entry pillars, would not be mining coal under the terms of the lease; and the evidence does not show that the entry and room pillars were drawn at different times. They probably pushed the business of both enterprises at the same time, at least there is nothing in the evidence to indicate they did not.

We see nothing in this record so far as the charge of the court is concerned for which this case ought to be reversed.

So far as the verdict is concerned, we are not prepared to say but that it is right, but at all events we would not be at liberty to consider that question for the reason we do not have all of the evidence before us that was before the jury in the court below. They used a map largely in the testimony in this case, and witnesses pointed to it, pointed places out upon it, horse backs in the mine here and there, etc. It was patent and plain to the jury, but it is entirely unintelligible to us, so that in any event we could not examine the question whether the verdict was sustained by the weight of the evidence or not; but so far as it is disclosed, and treating these matters as to the map as immaterial, we do not see how the jury could have done anything else than what they did. So far as the amount of the verdict is concerned, counsel said they had not taken the trouble to compute the amount, nor have we.

The judgment of the court below will be affirmed.

*T. W. Sanderson*, for Plaintiff.

*W. S. Anderson*, for Defendant.